UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL [UNDER SEAL], | ) ) Case No. 6:15-CV-1515-CRL-41-DAB ) |
| | ) ~~FILED UNDER SEAL PURSUANT~~ |
| Plaintiffs, | ) **TO 31 U.S.C. §3730(B)(2)** ) |
| | ) **DO NOT PLACE IN PRESS BOX** |
| v. | ) **DO NOT ENTER ON PACER** ) |
| [UNDER SEAL], | ) COMPLAINT FOR DAMAGES UNDER ) THE FEDERAL FALSE CLAIMS ACT |
| Defendants. | ) ) |
| | ) ) ) ) |
| _____ | ) DEMAND FOR JURY TRIAL |

2015 SEP 15   PM 2: 57
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

FILED

S-1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL WILLIAM ANTHONY LOVELL and ROCHELLE MENDEZ, | ) ) ) ) | Case No. $U:15CV·1515·CRL-41-DAB$ |
| | ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(B)(2)** |
| Plaintiffs, | ) ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| v. | ) ) | **DO NOT ENTER ON PACER** |
| | ) | |
| FLORIDA EYE CLINIC, SONDRA HOFFMAN, BONNIE CAPPELLO, ROBERT B. FELDMAN, PETER C. GRUENBERG, JOHN L. ISLER, JAMES M. JOCHUM, MYHANH T. NGUYEN, HARRY R. PAPPAS, THOMAS O. STEEDLE, and CATHERINE WANG, | ) ) ) ) ) ) ) ) ) | COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT |
| | ) ) | |
| Defendants. | ) ) | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.     NATURE OF THIS ACTION ................................................................. 1

II.    PARTIES ........................................................................................... 2

       A.    The United States of America .......................................... 2

       B.    The Relators ..................................................................... 2

       C.    The Defendants ................................................................ 3

III.   JURISDICTION AND VENUE .......................................................... 6

IV.    BACKGROUND ALLEGATIONS .................................................... 7

       A.    The FCA—Generally ....................................................... 7

       B.    The Medicare Program—Generally .............................. 8

       C.    FEC's Medicare and MA Patients .................................. 8

       D.    FEC Contracted with Three MA Plans .......................... 9

       E.    Capitation Payments and the Need for Accurate Reporting ........................... 10

       F.    FEC's Reporting ............................................................... 11

V.     DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ...................... 12

       A.    Indirect False Claims: Falsification of Submissions to MA Capitation
             Plans ................................................................................. 12

       B.    Direct False Claims: Upcoding, Submissions of Claims for Services Not
             Rendered, and Unbundling .............................................. 14

             1.    Defendants Submitted False Diagnosis Codes to Get Denied
                   Medicare Claims Paid ............................................. 15

             2.    Defendants Knowingly Submitted "Upcoded" Claims ...................... 15

             3.    Defendants Knowingly Submitted False Claims for Services
                   that Were Never Rendered to Their Patients ......................... 17

             4.    Defendants Knowingly Submitted "Unbundled" Claims .................. 19

VI.     COUNTS.........................................................................................................20

        A.      COUNT I (False Records) – FCA 31 U.S.C. §3729(a)(1)(B) .......................20

        B.      COUNT II (False Claims) – FCA 31 U.S.C. §3729(a)(1)(A) ........................21

VII.    PRAYER FOR RELIEF ................................................................................22

VIII.   DEMAND FOR JURY TRIAL ......................................................................22

Qui Tam plaintiffs William Anthony Lovell ("Lovell") and Rochelle Mendez ("Mendez" and together with Lovell, the "Relators"), through their attorneys, Robbins Arroyo LLP, bring this action on behalf of the United States of America, under the False Claims Act, 31 U.S.C. §3729, *et seq*. ("FCA"), based upon personal knowledge, relevant documents, and information and belief, and in support thereof state and allege as follows:

## I.     NATURE OF THIS ACTION

1.     This lawsuit is based on false claims being submitted to the federal government, indirectly through Medicare Advantage ("MA") plans, and directly through Medicare, by Florida Eye Clinic ("FEC") and its individual shareholder optometrists, ophthalmologists, and management (the "Individual Defendants" and together with FEC, the "Defendants").

2.     The allegations arise from conduct occurring from at least 2006, or earlier, and continuing on to the present date (the "Relevant Period").

3.     More specifically, regarding the indirect false claims, Defendants engaged in a continuous and systematic practice of causing false claims to be submitted to Medicare, through providing false and fraudulent information to MA plan providers, in violation of 31 U.S.C. §3729(A)(2). In addition, Defendants directly submitted false claims to Medicare, by submitting wrongfully upcoded claims, submitting claims for services not rendered, and submitting improperly unbundled claims, each in violation of 31 U.S.C. §3729(A)(1). By engaging in this illegal scheme to maximize profits, Defendants caused each such claim they submitted to the federal government to be materially false and substantially inflated.

## II.  PARTIES

### A.  The United States of America

4.     The United States of America is the real plaintiff in interest with respect to the claims asserted herein.  The Medicare program is administered and supervised by the Centers for Medicare & Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS").  The MA program is administered by private insurance companies that contract directly with, and are reimbursed by, Medicare, in order to provide patients with insurance coverage.

### B.  The Relators

5.     Relator Lovell worked for FEC from 2006 to January 2015, in various roles including accounts receivable, payment posting, and as a billing supervisor.  During his tenure with FEC, relator Lovell gained direct, personal, and independent knowledge that FEC is submitting false and fraudulent claims for payment to the United States, through its Medicare program, consistent with the allegations herein.

6.     Relator Mendez worked for FEC from 2006 to January 2015, in various roles including patient demographics, charge entry, and as a billing supervisor.  During her tenure with FEC, relator Mendez gained direct, personal, and independent knowledge that FEC is submitting false and fraudulent claims for payment to the United States, through its Medicare program, consistent with the allegations herein.

C.    **The Defendants**

7.      Defendant FEC is a multi-purpose optometry practice owned by at least eight shareholder physicians named as defendants herein. Currently, defendant FEC consists of twelve ophthalmologists and fourteen optometrists.

8.      Defendant Sondra Hoffman ("Hoffman") is FEC's Chief Executive Officer and has been since January 2013. Defendant Hoffman has direct and personal knowledge of FEC's continuous and systematic abuse of Medicare. Moreover, defendant Hoffman was directly involved in covering up the wrongdoing discussed herein by confiscating evidence in support thereof from relator Lovell.

9.      Defendant Bonnie Cappello ("Cappello") was FEC's Chief Financial Officer ("CFO") from September 2005 to January 2015. Defendant Cappello has direct and personal knowledge of FEC's continuous and systematic abuse of Medicare. The Relators and various other FEC employees complained to defendant Cappello about the wrongdoing discussed herein. Defendant Cappello ignored these complaints and instructed FEC's employees, including the Relators, to continue engaging in illegal conduct in violation of the FCA.

10.      Defendant Robert B. Feldman ("Feldman") is a shareholder of FEC. He has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Feldman is certified by the American Board of Ophthalmology and has been since 1986. Defendant Feldman graduated from Inteflex, University of Michigan, Ann Arbor, in 1981 and completed his residency at the University of Florida, Gainseville, from 1982 until 1985.

11.     Defendant Peter C. Gruenberg ("Gruenberg") is a shareholder of FEC.  He has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Gruenberg is certified by the American Board of Ophthalmology and has been since 1983. Defendant Gruenberg graduated from the University of North Carolina Medical School at Chapel Hill in 1977 and completed his residency at the Massachusetts Eye and Ear Infirmary at Harvard Medical School from 1979 until 1982.

12.     Defendant John L. Isler ("Isler") is a shareholder of FEC.  He has direct and personal knowledge of the procedures performed and billing practices at FEC.  Defendant Isler is certified by the American Board of Ophthalmology and has been since 1979 and is also certified by the American Board of Eye Surgeons and has been since 1991.  Defendant Isler graduated from New York Medical College in 1974 and completed his residency at the Manhattan Eye, Ear and Throat Hospital in New York, New York, from 1975 until 1978 and was Chief Resident from 1977 until 1978.

13.     Defendant James M. Jochum ("Jochum") is a shareholder of FEC.  He has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Jochum is certified by the American Board of Ophthalmology and has been since 1994. Defendant Jochum graduated from Georgetown University, School of Medicine in 1985 and completed his residency at the National Naval Medical Center in Bethesda, Maryland, from 1989 until 1992.

14.     Defendant Myhanh T. Nguyen ("Nguyen") is a shareholder of FEC.  She has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Nguyen is certified by the American Board of Ophthalmology and has been since

2008. Defendant Nguyen graduated from the University of Florida, College of Medicine in 2003 and completed her residency at the New England Medical Center, Tufts University in Boston, Massachusetts, from 2004 until 2007.

15.     Defendant Harry R. Pappas ("Pappas") is a shareholder of FEC. He has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Pappas is certified by the American Glaucoma Society and has been since 1993, the American College of Eye Surgeons and has been since 1991, the American Board of Eye Surgery and has been since 1991, the American Board of Ophthalmology and has been since 1985, and the National Board of Medical Examiners and has been since 1980. Defendant Pappas also holds a medical license by the state of Florida since 1985 as well as a medical license by the commonwealth of Massachusetts since 1983. Defendant Pappas graduated from Brown University Medical School in Providence, Rhode Island, in 1979 and completed his residency at the Wilmer Ophthalmological Institute of John Hopkins Medical School from 1980 until 1983.

16.     Defendant Thomas O. Steedle ("Steedle") is a shareholder of FEC. He has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Steedle is certified by the American Board of Ophthalmology and has been since 1981 and is also certified by the National Board of Medical Examiners and has been since 1977. Defendant Steedle graduated from the University of Pittsburgh School of Medicine in 1976 and completed his residency at the University of Cincinnati Medical Center from 1977 until 1980.

17.     Defendant Catherine Wang ("Wang") is a shareholder of FEC.  She has direct and personal knowledge of the procedures performed and billing practices at FEC. Defendant Wang is certified by the American Board of Ophthalmology and has been since 2003.  Defendant Wang graduated from Northeastern Ohio Universities College of Medicine in Rootstown, Ohio, in 1998 and completed her residency at CWRU/University Hospitals of Cleveland in 2002.  Defendant Wang was also the Chief Resident in 2002.

18.     The defendants identified in ¶¶8-17 are also collectively referred to herein as the "Individual Defendants."

## III.   JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

20.     Relators are aware of no jurisdictional bars to this action.  The misconduct allegations set forth herein were presented to Defendants by Relators during their time of employment.  To the extent there has been any public disclosure, Relators constitute an "original source" pursuant to 31 U.S.C. §3730(e)(4).  Counsel for Relators voluntarily provided the facts underlying these claims to the United States on August 12, 2015, during a telephone conference with an HHS agent.

21.     Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§1391(b) and 1395(a) and 31 U.S.C. §3732(a), as Defendants can be found, reside, transacts business, or otherwise engage in fraudulent conduct within this District.

## IV.    BACKGROUND ALLEGATIONS

### A.    The FCA—Generally

22.    The FCA prohibits several variations of fraud on the government.

23.    Among other things, the FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval, and conspiring to defraud the government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. §§3729(a)(1)(A).

24.    Additionally, the FCA prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record or statement to get a false or fraudulent claim paid or approved by the federal government. 31 U.S.C. §3729(a)(1)(B).

25.    The FCA defines "knowing" as acting with a deliberate ignorance of, or reckless disregard of, the truth or falsity of the information.  31 U.S.C. §3729(b).

26.    The statute allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery obtained.  It requires that the complaint be filed under seal for a minimum of sixty days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

27.    Any person who violates the FCA is liable for a civil penalty of not less than $5,000, up to $11,000, for each violation, plus three times the loss sustained by the United States. 31 U.S.C. §3729(a).

### B.    The Medicare Program—Generally

28.    In 1965, Congress enacted Title XVIII of the Social Security Act (Medicare) to pay for the cost of certain medical services for persons aged sixty-five years or older and those with disabilities.

29.    Medicare is a program of the federal government and is administered by CMS.  In addition to the administrative functions performed by CMS, much of the daily administrative tasks are contractually managed by private insurance companies.

### C.    FEC's Medicare and MA Patients

30.    FEC has many patients.  Some of its patients are covered by traditional fee-for-service coverage under Medicare Parts A and B.

31.    Some of FEC's other patients are covered by MA plans.

32.    MA, otherwise known as Medicare "Part C," authorizes qualified individuals to opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services.

33.    The government pays MA plan participants a set amount of money based on certain risk factors and other characteristics relating to the enrollers of the plans, rather than paying for a fee for specific services performed.

34.    The government, through CMS, makes advance monthly payments to MA plan participants calculated on, among other things, the number of enrollees, adjusted to reflect risk and variations in rates within the plan's service area.  In making advance monthly payments under the MA plans, the government relies on data received by the MA plans'

participants and the participants' healthcare providers, to adjust the advance monthly payments as needed.

**D.     FEC Contracted with Three MA Plans**

35.     Over the Relevant Period, FEC had contracts with at least three different MA plan participants: Premier Medicare Advantage ("Premier"), Humana Medicare Advantage ("Humana"), and Advantica.[1]

36.     Each of the three above-referenced MA plans individually contracted with FEC, among other healthcare providers, to obtain health services for the MA plans' enrollers (or subscriber-patients).

37.     The MA plans pay healthcare providers, such as FEC, a fixed capitation (or "cap") rate each month based on the number of patients, regardless of whether or not the patients seek services and no matter which services or how many services are provided. (This was known amongst coders as "Per Member Per Month" or "PMPM.")  However, in order to adjust the payments appropriately, the healthcare providers of the MA plans must report certain treatment data to the MA plans on a regular basis (usually on a monthly basis).

38.     In addition to the fixed capitation rate based on patient count, the MA plans pay healthcare providers, such as FEC, a bonus amount based on a risk-formula, associated with the health and treatment of the patients.  The riskier the patient, due to poor health and chronic conditions, the more money the healthcare provider would be reimbursed by the MA plans.

---

[1] It is relators' understanding that in 2015, Advantica is no longer a contracted MA plan. However, FEC continues to accept Advantica eye care insurance.

39.     During the Relevant Period, FEC had capitation plan contracts with Premier, Humana, and Advantica, for approximately the following monthly reimbursement amounts, as referenced in the table below:

| PLAN | 2013 | 2014 | 2015 |
|---|---|---|---|
| Premier Cap | $30,000 | $30,000 | $30,000 |
| Humana Cap | $180,000 | $150,000 | $200,000 |
| Advantica Cap | $100,000 | $100,000 | N/A |

**E.     Capitation Payments and the Need for Accurate Reporting**

40.     Capitation payments are used by managed care organizations (including MA plans such as Premier, Humana, and Advantica) to control health care costs. Capitation payments control the use of health care resources by putting the physician (or healthcare entity, such as FEC) at financial risk for services provided to patients.  At the same time, in order to ensure that patients do not receive sub-optimal care through under-utilization of health care services, managed care organizations (such as the MA plans) measure rates of resource utilization in physician practices, often by obtaining reports from the healthcare services providers.

41.     Such reports, which can be referred to as patient treatment reports, provided by the healthcare providers, such as FEC, to the MA plans, such as Premier, Humana, and Advantica, affect future payment amounts to both the healthcare providers (who are getting paid from the MA plans) and the MA plans (who are getting paid from the government).

42.     Patient treatment reports are relied upon by both the MA plans and by the government, with regard to making future MA-related payments.  For example, if the data in the reports, which is shared with the government, is falsely inflated to suggest that patient treatments are more significant (in number and/or substance) than they really are, it would

cause the government to pay higher amounts of money under the applicable MA plans for which false reporting data was provided.

**F.      FEC's Reporting**

43.      On a regular basis throughout the Relevant Period (that is, quarterly until about 2014, and monthly thereafter), the MA plan providers who had contracted with FEC to provide healthcare services for the *patient-subscribers* of the MA plans would require FEC to report the number of *subscriber-patients* (a.k.a. enrollers) treated under each MA plan during each applicable reporting period. These "patient counts" would then be used by the respective MA plans to report to the government so that the government could use the data, among other factors, to adjust the payments to the MA plans and so that the MA plans could adjust the limits on the capitation payments made to FEC.

44.      Thus, for example, if FEC provided patient counts which were lower than the contracted limit under the MA plans, the MA plans would decrease the monthly payments accordingly. On the other hand, if FEC continuously submitted patient counts that met or exceeded the patient count limits, the MA plans would maintain or increase the monthly payments made to FEC accordingly.

45.      In addition to the patient count reporting, FEC would also provide the MA plans with claim forms, which contained additional patient data, which data (like the patient count data) was submitted by the MA plans directly to Medicare for reimbursement purposes. The claims forms contained patient information including, but not limited to, the date of treatment, place of service, and chronic condition codes.

46.     As such, the Defendants were financially motivated to report high patient counts (to increase its cap rate) as well as report inflated patient data (such as upcoded or false chronic condition codes – to increase its bonus payments).  Inflated (or false) data reporting to the MA plans would help FEC maintain or receive higher reimbursements, and avoid having the MA plans decrease the monthly payments to FEC due to lower than expected patient counts and less risky patients.

47.     Of course the Defendants knew that all data reported by FEC to the MA plans was also shared with Medicare, for reimbursement purposes relating to FEC.

## V.     DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

48.     Since at least 2006, Defendants have knowingly and intentionally violated Medicare rules and regulations regarding the reimbursements sought from Medicare by engaging in a continuous and systematic practice of:

(a)     indirectly causing false claims to be submitted to Medicare, through providing false and fraudulent information to MA plan providers, in violation of 31 U.S.C. §3729(A)(2); and

(b)     directly submitting false claims to Medicare, by among other things: (i) submitting wrongfully upcoded claims; (ii) submitting claims for services not rendered; and (iii) submitting improperly unbundled claims, each in violation of 31 U.S.C. §3729(A)(1).

### A.     Indirect False Claims: Falsification of Submissions to MA Capitation Plans

49.     As referenced above, throughout the Relevant Period, on a quarterly basis until 2014, and on a monthly basis after 2014, pursuant to the MA plan contracts, FEC was

required to submit patient count data in support of its cap rate, and submit patient care data in support of its bonus payment. The patient care data was reported in claim forms which included chronic condition codes, and other treatment data. All the data reported was provided to the MA plans, for purposes of sharing with the government, in regard to payments to be made to the Defendants.

50.     FEC uses an electronic health records management system called "Allscripts," to track each patient's medical records, including number of patient visits per recording period, procedures provided, and applicable diagnosis codes.

51.     However, for purposes of providing the number of subscriber-patients' treatment during each reporting period, as required by the MA plans, the Defendants created a report that contained a purported patient count number, which the Defendants call a "Crystal Report."

52.     The Crystal Reports submitted by the Defendants to the MA plans, were false. The patient count information on the reports was intentionally inflated by the Defendants in an effort to maintain, or even increase, their payments from the MA plans.

53.     The Defendants knew that the Crystal Reports were false and they knew that the Crystal Reports did not conform to the patient count data that is maintained by the Defendants' Allscripts database system.

54.     The Defendants knew that the false Crystal Reports would be used by the MA plans to report to the government, and to get claims that were submitted to the government, paid or approved by the government.

55.     The patient care data on the claim forms submitted by the Defendants to the MA plans was also false.  For example, in order to wrongfully increase the FEC bonus payment from the MA plans, FEC would and did instruct its staff to falsify or upcode its patient care data, such as inserting chronic condition codes when in fact, such codes were false or inflated.  FEC would do this to increase the apparent risk levels of its patients and thus obtain a wrongfully inflated bonus payment for accepting patients who appear to be riskier than they truly were.

56.     As with the false patient count data, Defendants knew they were reporting false patient care data and that the false patient care data would be used by the MA plans to get claims that were submitted to the government, paid or approved by the government.

57.     Defendants' continuous and systematic fraudulent scheme of inflating patient counts on the Crystal Reports, and inflating or falsifying patient care data, caused the MA plan administrators to increase the capitation and bonus reimbursements to FEC, and caused damages to the government through the government's approval and payment of claims containing the false and inflated data.

**B.      Direct False Claims: Upcoding, Submissions of Claims for Services Not Rendered, and Unbundling**

58.     In addition to indirectly submitting false claims through the MA plans, Defendants directly submitted false claims to Medicare, by among other things:    (i) submitting wrongfully upcoded claims; (ii) submitting claims for services not rendered; and (iii) submitting improperly unbundled claims, each in violation of 31 U.S.C. §3729(A)(1).

1.    **Defendants Submitted False Diagnosis Codes to Get Denied Medicare Claims Paid**

59.    Throughout the Relevant Period, Defendants repeatedly and systematically would use the Allscripts database system to track denied Medicare claims and then use the Allscripts database system to change the diagnosis codes of the denied claims, months after the fact and inconsistent with the diagnoses in the actual patient files, so that the Defendants could then "rebill" Medicare for the denied claims, using a false diagnosis code.

60.    Medicare would rely on the false diagnosis codes to pay the false claims to the Defendants.

2.    **Defendants Knowingly Submitted "Upcoded" Claims**

61.    During the Relevant Period, Relators personally witnessed Defendants, mainly through the use of FEC's CFO, defendant Cappello, instruct its employees, namely its "charge entry" employees, to "upcode" claims for submission to Medicare for payment. "Upcoding" is the assigning of an inaccurate billing code for a medical procedure or treatment, to illegally increase the reimbursement, in this case, from Medicare.

62.    Relators cannot recall all of the different current procedural terminology ("CPT") billing codes that were wrongfully "upcoded," but just one example that they do recall is that new patients, who were supposed to be billed under new patient CPT code 99204, were instead systematically and regularly "upcoded" to a more expensive, more complex, new patient CPT code of 99205, even though the medical records clearly contradict the higher code.[2]

_____

[2]   According to the 2015 CMS Physician Fee Schedule for Carrier Locality [0910299], a description of the 2015 guidelines and reimbursement amounts of each of the relevant

63.     A similar example to the above is the "upcoding" of established patient codes. For example, Relators are aware that established patients, who were supposed to be billed under established patient CPT code 99214, were instead systematically and regularly "upcoded" to a more expensive and more complex CPT code of 99215, again, even though the patients' medical records clearly conflict with the higher CPT code. [3]

64.     According to the Relators, in addition to the specific examples discussed above, most of the evaluation and management ("E/M") procedures conducted by defendants Nguyen and Isler, in particular, were upcoded CPT codes, which did not meet the necessary guidelines for those codes.

65.     Relators routinely would complain and question FEC's actions regarding these and other apparent frauds alleged herein, but they would routinely be ignored, or told not to worry about it, or otherwise told that their concerns would be looked into, but they were not.

66.     Defendants were financially motivated to falsely submit claims with upcoded billing because the higher CPT codes equate with higher dollars billed to and paid by Medicare to the Defendants.

---

procedure codes for FEC are as follows: CPT code **99204** – New Patient Visit, comprehensive history and exam with medical decision making of moderate complexity. Typical face-to-face time of forty-five minutes. Reimbursement amount is **$132.24**. CPT code **99205** – New Patient Visit, comprehensive history and exam with medical decision making of high complexity. Typical face-to-face time of one hour. Reimbursement amount is **$171.94**.

[3] CPT code **99214** – Established Patient Visit, detailed history and exam with medical decision making of moderate complexity. Patient presenting problem of a moderate to high severity. Typical face-to-face time of twenty-five minutes. Reimbursement amount is **$79.27**. CPT code **99215** – Established Patient Visit, comprehensive history and exam with medical decision making of high complexity. Patient presenting problem of a moderate to high severity. Typical face-to-face time of forty minutes. Reimbursement amount is **$112.83**.

### 3. Defendants Knowingly Submitted False Claims for Services that Were Never Rendered to Their Patients

67.     Another, even more egregious, example of the systematic and continuous fraudulent conduct perpetrated by the Defendants against Medicare over the Relevant Period, includes the false billing to Medicare for services that were never rendered to the Defendants' patients or to individuals who were never even patients of FEC.

68.     This fraud was uncovered by the Relators in connection with the Patient Encounter Forms ("PEFs").  PEFs are pre-printed forms that are used to document the services that are provided by the Defendants to patients during the patients' visits.  The PEFs are included within each patient's chart during each patient's visit to FEC.

69.     On several occasions, the Relators witnessed the Defendants, primarily through FEC's CFO, defendant Cappello, repeatedly and firmly communicate to the various "charge entry" employees of FEC, that if the PEF marked a particular medical service, they were to bill it (to Medicare or the other insurer providers) even if the patient file indicated that the service had clearly not been provided.

70.     Defendant Cappello's mantra was, "if it is marked [on the PEF] bill it!"

71.     Throughout the Relevant Period, Relators became personally aware that FEC was submitting numerous false claims for procedures that had been "marked" on the PEF but were never actually rendered to the patient, such as:  glaucoma screenings, visual fields tests,

ophthalmoscopy, fundus photography, optical coherence tomography, gonioscopy,[4] fluorescein angiography,[5] and corneal topography.[6]

72.    The Relators would often tell the "charge entry" employees not to bill for services, even if marked on the PEF, if the services, according to the patient charts/files, were clearly not provided. Yet, the Relators' guidance to the "charge entry" employees was clearly and firmly overridden by the Defendants.

73.    Throughout the Relevant Period, Relators expressed concern and confusion about what the Defendants were doing in regards to their improper billing to Medicare of the unsupported PEF-related services.

74.    Moreover, between 2010 and October 2014, Relators expressed such concern about these fraudulent practices that they asked defendant Cappello to reverse the charges or provide some explanation or justification for the seemingly fraudulent billing. Defendants declined to provide an explanation or fix the issue and instructed employees to continue billing Medicare for services never rendered.

75.    In addition to the fraudulent billing practices surrounding PEFs, Defendants also wrongfully billed Medicare for individuals who were never actual patients of FEC. On a weekly or at least monthly basis, FEC received a list of individual referrals (the "referral list") from a primary care physician who had a personal connection to FEC. Rather than treat

---

[4] Gonioscopy is an eye examination to look at the front part of an eye between the cornea and the iris to see whether the area where fluid drains out of the eye is open or closed.

[5] Fluorescein angiography is an eye test that uses a special dye and camera to look at blood flow in the retina and choroid, the two layers in the back of the eye.

[6] Corneal topography is a medical imaging technique for mapping the surface curvature of the cornea.

the patients on the referral list, FEC would falsely represent that some or all of the patients on the referral list were treated at certain public fairs or facilities, when in fact they were not. Regardless of a patient's attendance, during the Relevant Period, the Defendants would bill Medicare for services rendered to the patients on the referral list even if FEC never saw them or treated them in anyway.

### 4. Defendants Knowingly Submitted "Unbundled" Claims

76. In addition to all of the above, as further specific evidence of Defendants' illegal acts, Relators also witnessed repeated violations of the FCA by the Defendants through the use of "unbundling."

77. "Unbundling" refers to the practice of using two or more CPT billing codes, instead of one inclusive code, in order to obtain a higher reimbursement from Medicare, for tests and services performed.

78. More specifically, just one example of the Defendants' illegal unbundling involves the Defendants' improper use of a modifier code (specifically code 59) to allow them to bill Medicare for fundus photography ("FP") (CPT code 92250) on the same date that they billed Medicare for optical coherence tomography ("OCT").

79. Generally, OCT is billed to Medicare using the CPT code 92133 or 92134. Both codes include FP.

80. When an OCT code is billed, FP should not be billed separately from the OCT code, unless a modifier is used to signal to Medicare that a procedure or service (in this example, FP) was distinct or independent from other services (in this example, OCT) performed on the same day.

81.     Modifier 59 is used to identify procedures/services that are not normally reported together, but are appropriate under the circumstances.

82.     For example, modifier 59 may represent a different session or patient encounter, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same physician.

83.     During the Relevant Period, Relators became personally aware of the Defendants fraudulently submitting improperly unbundled claims to Medicare by using modifier 59 with the CPT code 92250 for FP, when the FP service should have been included with (and not unbundled from) the CPT code for OCT that was billed to Medicare on the same date.

84.     In particular, defendant Feldman, among other Individual Defendants, had a systematic and widespread practice of unbundling procedures for FP and OCT billed on the same date of service.

85.     The government can verify the existence of these alleged false claims.

## VI.     COUNTS

### A.     COUNT I (False Records) – FCA 31 U.S.C. §3729(a)(1)(B)

86.     Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

87.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§3729, *et seq.*, as amended.

88.     By virtue of the acts set forth above, Defendants have knowingly made, used, or caused to be made or used, false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. §3729(a)(1)(B).

89.     The United States of America, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

90.     As a result of the Defendants' acts, the United States of America has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**B.      COUNT II (False Claims) – FCA 31 U.S.C. §3729(a)(1)(A)**

91.     Relators incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

92.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§3729, *et seq.*, as amended.

93.     By virtue of the acts set forth above, Defendants presented or caused to be presented, false or fraudulent claims for payment or approval to the United States government in violation of 31 U.S.C. §3729(a)(1).

94.     The United States of America, unaware of the falsity of the claims, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

95.     As a result of the Defendants' acts, the United States of America has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## VII. PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States of America, respectfully request this Court to enter judgment for Relators, and on behalf of the United States, and against Defendants, on each count of this Complaint, and to impose judgment against the Defendants and in favor of the Relators, on behalf of the United States, as follows:

A.     for the United States of America be awarded damages in an amount equal to three times the loss sustained by the United States because of false claims and fraud alleged herein, as the FCA provides;

B.     for civil penalties of in statutorily-determined amounts for each and every false claim that Defendant presented to the United States of America and/or its representatives;

C.     for an award to the Relators for reasonable expenses, attorneys' fees, and costs incurred in connection with this action;

D.     for the Relators to be awarded the maximum amount allowed, pursuant to the FCA; and

E.     that this Court award such other and further relief as it deemed proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demands a trial by jury.

Dated: September 14, 2015                    BROWN LAW, P.L.

_____
STEEN JAMES BROWN

FL Bar #53976

- 22 -

126 E. Colonial Drive
Orlando, FL 32801
Telephone: (407) 344-3400
Facsimile: (407) 344-3440
sbrown@brownlawpl.com

ROBBINS ARROYO LLP
Brian J. Robbins
Kevin A. Seely
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinarroyo.com
kseely@robbinsarroyo.com

Attorneys for Qui Tam Plaintiffs

1031820